(A.R.D. 197)

UNITED STATES *v.* MINE SAFETY APPLIANCES COMPANY

Entry No. 1322, etc.

Third Division, Appellate Term

(Decided September 27, 1965)

*John W. Douglas*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellant.

*Jerome G. Clifford* for the appellee.

Before DONLON and RICHARDSON, Judges; DONLON, J., concurring

RICHARDSON, Judge: This is an application which was filed by the Government seeking a review of the decision and judgment of a single judge sitting in reappraisement in *Mine Safety Appliances Company v. United States*, 52 Cust. Ct. 465, Reap. Dec. 10691, and holding that cost of production, as defined in 19 U.S.C.A., section 1402(f) (section 402(f), Tariff Act of 1930), is the proper basis for determining the value of parts of miners' safety lamps that were exported from Scotland and entered at Pittsburgh, Pa. It is appellant's contention that foreign value, as defined in 19 U.S.C.A., section 1402(c) (section 402 (c), Tariff Act of 1930, as amended), and representing the appraised values herein, constitutes the proper basis for determining the value of the subject merchandise.

The evidence which was before the single judge consists of an affidavit of Richard Crawford, managing director of Mine Safety Appliances Company, Ltd., which company is the manufacturer and exporter of the involved merchandise (plaintiff's exhibit 1), the testimony of Robert E. Havener, an electrical engineer and the product line manager for the plaintiff-importer, and a letter from the

exporter to the importer to which is attached a pricelist for the model "L" lamp and accessories (defendant's exhibit A). The material portion of Mr. Crawford's affidavit is set forth in paragraph 8 thereof and reads as follows:

From the knowledge gained as a result of my experience, associations and study as set forth above, I can state that:

a) During my tenure of office as Managing Director, MSAC, LTD. has been and now is the sole manufacturer or producer of mine safety lamps and parts therefor in Scotland;

b) Since incorporation it has been the practice in the trade of MSAC, LTD to offer for sale and to sell mine safety lamps and parts thereof either directly or through agents or representatives acting for and on behalf of MSAC, LTD for home consumption in Scotland to those purchasers only who purchased these products for their own use and consumption and not for resale to others and to offer them for sale and to sell for exportation to the United States of America to MSAC, USA, exclusively.

c) It was the long established practice in the trade of MSAC, USA to offer for sale and to sell mine safety lamps and parts thereof of MSAC, LTD manufacture imported into the United States of America, to those purchasers only who bought them for their own use and consumption and not for resale to others;

d) During my tenure of office as Managing Director of MSAC, LTD mine safety lamps and parts thereof of other than MSAC, LTD manufacture and produced outside of Scotland were offered for sale and sold for home consumption in Scotland; to the best of my knowledge they were not offered for sale and sold in Scotland for exportation to the United States of America. The principal manufacturers other than MSAC LTD of lamps being sold or offered for sale in Scotland were:

Oldham Limited—Lead-Acid Lamp, manufactured mainly of lead, hard rubber and steel.

Nife Limited —Nickel Cadmium Lamp, manufactured mainly of nickel, cadmium, steel and rubber.

Ceag Limited —Nickel Cadmium Lamp, manufactured mainly of nickel, cadmium, steel and rubber.

e) It was the long established practice in the trade in Scotland at all times herein mentioned to offer to sell and to sell the mine safety lamps and parts thereof the subject of paragraph 8, subdivision d, herein and next preceding, either directly or through agents or representatives acting for and on behalf of manufacturers or producers thereof to purchasers who bought these products for their own use and consumption and for home consumption in Scotland only;

f) It was the industry-wide policy in Scotland to limit offers for sale and sales of commercially produced mine safety lamps and parts thereof of any kind, description or manufacture for home consumption in Scotland to buyers who purchased these products for their own use and in the aforesaid established course of trade no commercially produced mine safety lamps or parts thereof of any kind, description or manufacture were, at any of the times herein mentioned, offered for sale or sold for home consumption in Scotland to purchasers, such as retailers, dealers, wholesalers, etc., who purchased these products for the purpose of reselling them to others.

It was also stated in Mr. Crawford's affidavit, among other things, that the exporting company is a subsidiary of the importing company.

With regard to sales and offers made by the plaintiff-importer in this country of the involved lamps and parts, the testimony of Mr. Havener is as follows (direct examination):

Q. Who did you sell this merchandise to?—A. The merchandise was sold to the coal and metal mining companies in the United States and to Thomas A. Edison.

Q. Do you know the purpose they used it for?—A. The purpose was as a cap lamp for the miners to use as a light source underground.

Q. In other words, they use it in the manufacture of mine safety lamps, is that right?—A. Yes, sir.

Q. And those mine safety lamps that are manufactured by them are sold in the United States, is that right?—A. Yes, sir.

Q. Do you know whether or not any of these parts before the court are offered for sale or sold for resale in the United States?—A. None of them.

Q. At any of the times?—A. None during this period of time.

After colloquy between the court and counsel, Mr. Havener further testified:

Q. Are there any other mine lamps or parts of mine lamps imported from Scotland into the United States and offered for sale or sold in the United States that you know of?—A. No, sir.

Q. Would you know of any if there were?—A. I certainly would.

Q. In connection with your duties, is that so?—A. Yes, as responsible for sales, yes.

Q. Let me understand you, there are no mine safety lamps or parts of mine safety lamps imported into the United States from Scotland by anybody that are offered for sale or sold in the United States, is that what you say?—A. Yes.

And after further colloquy between the court and counsel, Mr. Havener testified as follows:

Q. You said that these lamps and parts of lamps the subject of this importation, and, incidentally, the only ones imported into the United States, are sold to Edison Company, right, and Edison Company incorporates these parts in another article, right?—A. Yes, sir.

Q. A mine safety lamp?—A. Yes, sir.

Q. Is that also true of the other company that you mention? You mentioned some other company?—A. The other company does not manufacture or does not import any mine safety parts.

Q. What was the name of that other company?—A. Kohler Manufacturing.

Q. What do they do?—A. They manufacture a lamp similar to ours.

Q. In the United States?—A. Yes, sir.

Q. And it's sold in the United States?—A. Yes.

Q. Offered for sale in the United States?—A. Yes, sir.

Q. But it's not manufactured of any merchandise imported from Scotland?—A. No, sir.

The foregoing evidence was offered on behalf of the importer. The letter which was offered on behalf of the Government as defendant's exhibit A is dated February 6, 1956, and is addressed to H. E. Redenbaugh, Esq., of the importing company, and is signed by G.G.T. Wright, secretary of the exporting company. The letter states:

Dear Mr. Redenbaugh,

We wish to acknowledge receipt of your letter of February 1st requesting from us particulars which your Customs Officials require covering Edison parts which you are importing from us.

We are enclosing four copies of our published price list and we would confirm that we have amended our records so that any alterations will be notified to you.

Since in this country our main customer is the National Coal Board and since we have always maintained a policy of selling direct to this customer, we do not normally have discounts on our sales of Edison Lamps and Parts in the United Kingdom. The prices, as per the enclosed price list are therefore those which we charge to the National Coal Board, although in various small instances, mainly bulbs and cables, we do sell to the National Coal Board at a special price which is controlled by the manufacturer. A considerable quantity of our sales of Edison Lamps and Parts, other than to the National Coal Board, are however accomplished through agents, and in these cases we do allow a commission of 15% from our normal list price.

It might be relevant to add that a considerable part of our business from this country is of an export nature. Since on the export side we are dealing through agents, we do allow discounts which vary between 15% and 40%, depending on the nature of the agency and consequently on the amount of sales work undertaken by the Agent.

Yours sincerely,
MINE SAFETY APPLIANCES COMPANY LTD.
G. G. T. WRIGHT,
Secretary.

The letter is stamped with the receipt of the appraiser of merchandise at the port of entry under date of February 20, 1956. It contains an attachment of a list of lamps and accessories with prices quoted for the various lamps and parts in quantities of 100.

The trial court reached the conclusion that the evidence established the existence of a restricted market for the subject merchandise both in Scotland and in the United States, thereby precluding the existence of a foreign, export, or United States market for the subject merchandise. In its conclusion, the court gave full weight to the evidence adduced by the plaintiff, but not sufficient weight to the evidence adduced by the defendant.

We view the evidence differently. We think the pricelist set forth in defendant's exhibit A does have evidentiary value. It is stated in the letter to which the list is attached that the list is a published pricelist, and it appears that, in practice, the prices set forth in the list

were substantially adhered to. Under these circumstances, we see no reason why the list should not be accorded full weight as evidence of a market price. *International Harvest Hat Co.* v. *United States*, 5 Cust. Ct. 592, 596, Reap. Dec. 5045. The list was produced in response to customs inquiries relating to valuation of the merchandise, and appears to have influenced the appraisement of the involved merchandise commencing with the very first importation.

We do not think that the affidavit of Mr. Crawford (plaintiff's exhibit 1) constitutes substantial evidence of the existence of a restricted market either in the country of exportation, or in the United States. The involved merchandise consists of both consumers' goods (lamps) and producers' goods (parts of lamps) which were sold to industrial users and producers in Scotland and to industrial users and producers in the United States. The same was true with respect to sales and offers in other parts of the United Kingdom which we consider to be the country of exportation and not Scotland, under the rule laid down in *Stairs* v. *Peaslee*, 59 U.S. 521, 526, that the word "country" embraces all the possessions of a foreign state, however widely separated, which are subject to the same supreme executive and legislative control. A statement in an affidavit that sales of the involved merchandise were restricted to industrial users and were not "offered for sale or sold for home consumption in Scotland to purchasers, such as retailers, dealers, wholesalers, etc.," without showing who were some of the persons falling into the categories represented to be excluded is not sufficient evidence to establish a restricted market.

Were sales and offers limited to industrial users and producers of lamps and parts because there were no other classes of purchasers interested in or actually participating in the market? Or were there such other classes of purchasers and potential purchasers who were barred from participating in the market by reason of restrictions applied by the exporter? The language employed in plaintiff's exhibit 1 does not aid the court in determining into which of these categories the exporter's merchandising practices in the home market fell. There certainly is no requirement that purchasers or potential purchasers be actively solicited in a foreign market in order to establish a foreign market value for merchandise coming from such market. *Rico, Inc.* v. *United States*, 48 CCPA 110, 112, C.A.D. 773. It may well be that the exporter's merchandising requirements were satisfied with sales and offers to industrial users and producers. If so, such would then constitute offers and sales made in the ordinary course of trade. *American Shipping Co.* v. *United States*, 29 CCPA 250, 257, C.A.D.

198. It is the affirmative restrictive practices in such markets which the statutes condemn. And the uncertain turn of the evidence set forth in plaintiff's exhibit 1 is not convincing of the existence of such restrictive practices in the home market.

Neither do we find the case of *United States* v. *Graham & Zenger, Inc.,* 31 CCPA 131, C.A.D. 262, which is cited in the opinion of the single judge, applicable to the facts now before us. In that case, there were clear, affirmative governmental restrictions imposed for the purpose of stabilizing the glassware market prices. Moreover, that case did not deal with facts indicative of restrictions on categories of purchasers in the home market.

Inasmuch as the plaintiff (the appellee herein) carries the burden to overcome the presumption of correctness of the appraisement, and has adduced no additional evidence which negates the existence of a foreign market for the involved merchandise, the appraised values must be sustained. We, therefore, find as facts:

1. That the involved merchandise consists of various parts of mine safety lamps, manufactured in and exported from the United Kingdom between August 25, 1955, and January 22, 1958.

2. That the merchandise was appraised on the basis of foreign value, as defined in 19 U.S.C.A., section 1402(c) (section 402(c), Tariff Act of 1930, as amended).

3. That the record contains no substantial evidence that such or similar merchandise was not freely offered for sale to all purchasers in the principal markets of the United Kingdom for home consumption.

The court concludes as matters of law:

1. That the presumption of correctness of the appraisements herein has not been overcome.

2. That foreign value, as that value is defined in 19 U.S.C.A., section 1402(c) (section 402(c), Tariff Act of 1930 (as amended), is the proper basis for determining the value of the subject merchandise.

3. That such value is represented herein by the appraised values.

4. That the judgment of the trial court is reversed.

Judgment will be entered accordingly.

### CONCURRING OPINION

DONLON, Judge: I concur in the result because of the fatal defect in proof that is alluded to by Judge Richardson in his opinion, namely, that the United Kingdom, and not Scotland, is for tariff purposes the "country" from which this merchandise was exported. Since there is failure of proof as to the situs of the principal market in the United Kingdom and as to sales and offers to sell in that market, it is unnecessary to evaluate the proofs before us as to the Scottish market and I refrain from concurrence in views expressed as to such proofs.